**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**George W. O'Dell and**
**Donna M. O'Dell**

     **v.**                       Case No. 05-cv-40-PB
                                    Opinion No. 2010 DNH 159

**Michael J. Astrue, Commissioner,**
**Social Security Administration**

**MEMORANDUM AND ORDER**

George W. O'Dell moves to reverse the Commissioner of Social Security's determination that he is not eligible for disability insurance benefits ("DIB"). O'Dell bases his claim on a back injury he suffered in 1990. He focuses his appeal on the Commissioner's determination that he is not entitled to DIB because he was capable of performing sedentary work without restriction while he was still insured. For the reasons set forth below, I affirm the Commissioner's decision.

**I.   BACKGROUND[1]**

O'Dell was born January 25, 1947, and grew up in Massachusetts. George O'Dell was forty-three years old when he

---

[1] The background information is drawn from the Joint Statement of Material Facts submitted by the parties (Doc. No. 10) and the Administrative Record. Citations to the Administrative Record are indicated by "Tr."

allegedly became disabled.  Following a brief stint in the military at the age of twenty-one, O'Dell returned to Massachusetts and worked as a store clerk, a restaurant worker, a cab driver, and a distributor for a lawn chemical company.  (Tr. at 16.)  In 1988, O'Dell became a car salesman and worked in that capacity for several years.  (Tr. at 254.)

At the time of his injury, O'Dell was working as a salesman at Quirk Chevrolet in Braintree, MA.  (Tr. at 157.)  On March 23, 1990, O'Dell slipped on some sand and fell while at work.  (Tr. at 157.)  He alleges that this fall resulted in a disabling "disc problem" and a hairline fracture in his ankle.  (Tr. at 29.)

## A.   **Mental and Physical Impairments**

Prior to his injury, O'Dell suffered from a number of health issues.  In 1968 he began his working life by entering the Marine Corps.  Approximately one month into basic training, he experienced a "schizophrenic reaction of a catatonic type."  (Tr. at 118-25.)  He was then hospitalized and diagnosed with a pre-existing personality disorder.  Because of this disorder, O'Dell was discharged from the service.  (Tr. at 118-25.)

Following his discharge, O'Dell's personality disorder did not appear to affect him for another twenty years.  O'Dell worked various jobs and maintained relationships with his wife and children.  However, in March 1986, O'Dell was hospitalized due to

-2-

stress and ultimately diagnosed with a personality disorder with antisocial and borderline features.[2]  (Tr. at 134.)  O'Dell was also diagnosed with anxiety on two separate occasions in 1987 and 1988, both times following trips to the emergency room for chest pain.  (Tr. at 137, 141-42.)

O'Dell did not seek medical treatment of any kind again until his back injury in 1990.  O'Dell sought immediate medical attention after his fall at work and was diagnosed as having a "lower back sprain/strain and a question of a herniated disc" by medical professionals at the Harvard Community Health Plan.  (Tr. at 157.)  O'Dell neither sought nor received further medical treatment for this injury until he filed a Worker's Compensation claim and was required to be evaluated in connection with that

---

[2] Antisocial Personality Disorder is characterized by "continuous and chronic antisocial behavior in which the rights of others or generally accepted social norms are violated; associated personality traits include impulsiveness, egocentricity, inability to tolerate boredom or frustration, irritability and aggressiveness, recklessness, disregard for truth, and inability to maintain consistent, responsible functioning at work, at school, or as a parent."  Dorland's Illustrated Med. Dictionary 555 (31st ed. 2007).
    Borderline Personality Disorder is "marked by a pervasive instability of mood, self-image or sense of self, and interpersonal relationships; impulsive and self-damaging acts are common, as are uncontrolled anger, fears of abandonment, chronic feelings of emptiness, recurrent self-mutilating behavior and suicide threats, and transient, stress-induced periods of paranoia and dissociation."  Id. at 556.

claim.  (Tr. at 23.)

On June 10, 1991, over a year after his initial injury, the insurance company processing O'Dell's Worker's Compensation claim sent him to Dr. Arnold Miller.  (Tr. at 7, 153.)  Dr. Miller, an orthopedic surgeon at the Laconia Clinic in Laconia, NH, diagnosed O'Dell with "lower back strain."  (Tr. at 153.)  Dr. Miller went on to note, however, that he found no "hard objective evidence of nerve root impingement to suggest that there's a problem."  (Tr. at 153.)  Dr. Miller opined that O'Dell could not "do any kind of heavy work" and suggested some kind of work-hardening program to improve O'Dell's ability to sit so that he could do "light duty work at a sitting position."  (Tr. at 153.)  Dr. Miller suggested that O'Dell might be able to perform a sitting job for a maximum of three or four hours per day, and only if he were allowed to change positions frequently.  (Tr. at 154.)  Dr. Miller declared O'Dell "partially disabled," but concluded that he "certainly [did] not feel an end result ha[d] been achieved at th[e] time nor ha[d] [O'Dell] reached maximum medical improvement."  (Tr. at 154.)  Specifically, Dr. Miller noted that O'Dell had been unable to undergo further diagnostic testing because his claustrophobia prevented him from getting a

-4-

CT scan, and O'Dell had refused a myelogram.[3]  (Tr. at 153.)  Dr.
Miller made no mention of O'Dell's obesity or underlying mental
health issues as they pertained to O'Dell's ability to return to
work.  (Tr. at 153.)  Six months after his evaluation by Dr.
Miller, O'Dell settled his Worker's Compensation claim for
$45,000.  (Tr. at 157.)  At the time, O'Dell stated that he had
resolved his claim so that he could "pursue another business
opportunity."  (Tr. at 157.)

Over eight years passed before O'Dell again sought medical
treatment.  There is no other evidence from the period in
question regarding O'Dell's functional limitations.  When given
the opportunity to testify, O'Dell offered no information about
the persistence of his back problems throughout the 1990s, nor
did he explain how his physical limitations prevented him from
working.  (Tr. at 28-40.)  In testimony dated November 2, 2006,
O'Dell stated that he had spent the last three months (roughly

---

[3] A myelogram uses a special dye and x-rays to highlight the
space between the bones in the spine.  This technique is often
used to diagnose a herniated disc.  Stedman's Medical Dictionary
1013, 1369 (25th ed. 1990).
      It is unclear whether O'Dell simply refused further
diagnostic testing or whether he could not receive it due to a
pre-existing heart condition.  While Dr. Miller's note certainly
seems to suggest that O'Dell played a part in refusing testing
(Tr. at 153), the settlement document prepared in connection with
O'Dell's Worker's Compensation claim indicates that O'Dell was
physically unable to undergo further testing due to a heart
condition.  (Tr. at 157.)

August 2006 - October 2006) in bed due to severe pain but made no mention of such limitations during the relevant period.  (Tr. at 37.)  O'Dell did state when asked, however, that there had been no period of time since 1991 that he had been healthy enough to go back to work.  (Tr. at 37-38.)

On October 1, 1999, O'Dell saw Dr. Shadan Mansoor of Ammonoosuc Community Health Services in Littleton, NH.  Dr. Mansoor documented that O'Dell had had a "popped disc since 1990," and  later prescribed fifty Darvocet pills to O'Dell for "chronic back pain," with the expectation that O'Dell would make the pills last for four months.[4]  (Tr. at 183-84, 193.)  In June 2001, Dr. Mansoor noted that O'Dell had been swimming two hours every day and mowing his lawn.  (Tr. at 201.)

Several months later, O'Dell suffered an episode of depression.  In September 2001, O'Dell told Dr. Mansoor that he planned to leave his wife because he felt that he was a burden to her.  (Tr. at 213.)  O'Dell complained that he was depressed and could not sleep.  (Tr. at 213.)  He reported feeling tired and foggy, and said that he was having difficulty concentrating and felt too negative to talk to a counselor.  (Tr. at 213.)  Dr.

---

[4]  Darvocet is a prescription drug indicated for the relief of mild to moderate pain. Physician's Desk Reference at 402 (59th ed. 2005).

Mansoor formally diagnosed O'Dell's depression and prescribed
Remeron.[5]  (Tr. at 213.)

In a one-paragraph doctor's note dated March 2002, Dr.
Genevieve Kelley of the White River Junction Veteran's Clinic
stated that O'Dell was "completely disabled" and unable to do
work of any kind due to his multiple medical problems, including
morbid obesity.  (Tr. at 155.)  The note did not explain how or
why O'Dell's medical problems prevented him from working.  (Tr.
at 155.)

In September 2003, O'Dell sought the help of mental health
counselor Kevin Cole of the White River Junction veterans'
clinic.  Notes from this visit indicate that O'Dell thought his
long history of depression was a direct result of his guilt and
disappointment over not having served in Vietnam.  (Tr. at 226.)
O'Dell told Cole that he felt that he suffered from post-
traumatic stress disorder ("PTSD") from being beaten while in the
Marine Corps and from not being able to help fallen comrades.
(Tr. at 226.)  O'Dell admitted, however, that he had lied in the
past about being a combat veteran.  (Tr. at 226.)  Later that
month, Cole reported that O'Dell felt his depression was

---

[5]  Remeron is a prescription drug indicated for the
treatment of major depressive disorder. Physician's Desk
Reference 2924 (63d ed. 2009).

improving.  (Tr. at 229.)

In October 2005, fourteen years after the alleged onset date of his disability, Dr. Frank Graf evaluated O'Dell's residual functional capacity ("RFC").  (Tr. at 254-261.)  Dr. Graf, an orthopedist, concluded that O'Dell's morbid obesity and back condition rendered him "substantially impaired in all basic functional movement patterns of sitting, standing, walking, bending, stooping, lifting, pushing and pulling."  (Tr. at 256.) Dr. Graf reported that O'Dell should be  "considered disabled for all employment," and that "[h]is condition [was] expected to last consecutively month after month for a minimum of 12 months." (Tr. at 256.)  Dr. Graf also indicated that O'Dell was suffering from PTSD and multi-organ failure as a result of his exposure to Agent Orange in Vietnam.  (Tr. at 255, 261.)  Six months after rendering this opinion, Dr. Graf also opined that O'Dell was disabled as of December 30, 1991, his date last insured ("DLI"). (Tr. at 257.)

O'Dell's attorney requested that Marvin Kendall, M.D., of the Littleton, NH veterans' clinic review Dr. Graf's assessment of O'Dell.  (Tr. at 180.)  Dr. Kendall declared that, while disability determination was outside the scope of his practice, he agreed with Dr. Graf's conclusion that O'Dell was unable to do "any useful work."  (Tr. at 180.)  Dr. Kendall also stated that

he could not make a determination as to O'Dell's disability prior
to 1993.  (Tr. at 180.)

## II.  **PROCEDURAL HISTORY**

O'Dell first filed an application for DIB relating to this
injury in 1996.  (Tr. at 15 n.1.)  That claim was denied, and
O'Dell never appealed the decision, rendering it final.  (Tr. at
15 n.1.)  O'Dell filed a second application for DIB on May 30,
2002, alleging that he suffered from constant pain, had trouble
breathing, and felt weak constantly.  (Tr. at 43-52.)  The Social
Security Administration denied his application based on res
judicata, stating that O'Dell's 2002 claim presented the same
facts and issues as his 1996 claim, which had already been
denied.  (Tr. at 63-65, 78-79.)  O'Dell requested an
administrative hearing.  On July 21, 2004, an ALJ dismissed
O'Dell's request on res judicata grounds.  (Tr. at 78.)  O'Dell
appealed, and the Appeals Council denied O'Dell's request for
review.

O'Dell then filed a civil action in this Court.  On August
9, 2005, the Commissioner filed an assented motion to remand
pursuant to sentence six of 42 U.S.C. § 405(g), which states that
the Court may remand the case if the Commissioner can show good
cause.  The Commissioner explained that the ALJ and Appeals

-9-

Council had improperly applied the doctrine of <u>res judicata</u> to O'Dell's application because the standard for evaluating both musculoskeletal listings and mental impairments had changed since 1996.  (Tr. at 16.)  On August 11, 2005, this Court granted the Commissioner's motion.

On November 2, 2006, an ALJ held a hearing on remand to determine the merits of O'Dell's DIB application.  Pursuant to 20 C.F.R. § 404.1520, the ALJ conducted a five-step evaluation to determine whether O'Dell was disabled within the meaning of the Social Security Act ("the Act").  The ALJ considered (1) whether O'Dell was engaged in substantial gainful activity; (2) whether O'Dell had a severe impairment; (3) whether the impairment met or equaled a specific listing of impairment in the SSA regulations and met the duration requirement; (4) whether, given the current state of O'Dell's impairments, O'Dell could still do past relevant work; and (5) whether O'Dell could make an adjustment to other work given his RFC, age, education, and prior work experience.  20 C.F.R. § 404.1520.

On March 15, 2007, the ALJ issued a decision finding that O'Dell was not disabled during the period in question -- June 10, 1991, the alleged onset date, through December 31, 1993, O'Dell's DLI.  Specifically, the ALJ found at step 5 that O'Dell's RFC was consistent with the skills needed to perform the full range of

-10-

sedentary work.[6]  Because the ALJ also found that O'Dell was 44 years old when he first claimed to be disabled and had a high school education, the ALJ determined that he was required to find that O'Dell was not disabled.  (Tr. at 21, citing Rules 201.27-29, 201.21 and 201.22).  The ALJ based his conclusion that O'Dell was capable of performing the full range of sedentary work primarily on Dr. Miller's 1991 evaluation and the absence of other contemporaneous evidence suggesting that O'Dell was incapable of performing sedentary work.

The ALJ refused to credit Dr. Graf's opinion regarding O'Dell's RFC because it was not substantiated by "any clinical signs or other objective medical evidence of record during the period in question."  (Tr. at 19.)  The ALJ reported that, even though Dr. Graf referenced O'Dell's medical condition prior to his DLI, his failure to cite objective medical evidence rendered it useless in determining O'Dell's limitations during the period in question.  (Tr. at 19.)

---

[6]  Sedentary work is defined as a job in which one is mostly sitting, but may be required to walk or stand occasionally. Additionally, a person in a sedentary job will not be required to lift more than ten pounds at a time and will only occasionally be required to lift and carry small items such as files and docket ledgers.  20 C.F.R. § 404.1567(a).  "Occasionally" is defined as ranging from very little up to one-third of the time, or approximately two hours in an eight-hour work day.  S.S.R. 83-10 at 5 (West 1993).

Finally, the ALJ considered both O'Dell's obesity and mental impairments in the evidence, even finding his obesity to be severe.  (Tr. at 21.)  Regarding his mental impairments, the ALJ found that O'Dell "no longer had severe signs and symptoms" of depression during the relevant period, and noted that O'Dell presented no evidence indicating that his ability to work during the period in question was limited by underlying mental conditions.  (Tr. at 20.)  Ultimately, the ALJ found that neither O'Dell's obesity nor his mental impairments prevented him from performing the full range of sedentary work.  (Tr. at 21.)

O'Dell filed an exception to the ALJ's decision based on the fact that the ALJ had improperly considered Dr. Graf's RFC assessment and ignored Dr. Miller's projected limitations regarding O'Dell's ability to work.  (Tr. at 266.)  On August 27, 2009, the Appeals Council notified O'Dell that it was assuming jurisdiction of the case.

The Appeals Council issued its final decision on September 24, 2009, concluding that O'Dell was not disabled at any time during the relevant period.  (Tr. at 4-11.)  The Appeals Council specifically addressed the ALJ's failure to adopt Dr. Miller's opinion that O'Dell could only perform a sitting job for a limited period of time.  (Tr. at 7.)  The Appeals Council ultimately discredited that portion of Dr. Miller's opinion

-12-

because Dr. Miller provided no clinical findings or objective medical evidence to substantiate his opinion.  (Tr. at 9.) Lacking objective medical evidence, the Appeals Council found that there was no reason to believe that O'Dell's injury was as severe as that portion of Dr. Miller's opinion suggested.  (Tr. at 9.)  The Appeals Council further declared that O'Dell's lack of treatment between 1991 and 1999 was "inconsistent with the alleged severity of his back complaints," and that the record reflected "no evidence to indicate that [O'Dell] was treated for mental or cardiac impairments during the applicable period." (Tr. at 9.)

The Appeals Council also concluded that the ALJ was correct in refusing to credit Dr. Graf's retrospective RFC evaluation. (Tr. at 9.)  The Council noted that Dr. Graf's report was further discredited because Graf identified specific limitations that were based solely on O'Dell's false claims about the extent of his military service.  (Tr. at 9.)  Because the Council found that the ALJ was correct in concluding that O'Dell could perform the full range of sedentary work, it upheld the ALJ's decision that O'Dell was not disabled at any time during the relevant period.  (Tr. at 9.)  O'Dell timely appealed and the action again came before this Court.

O'Dell died on February 14, 2010.  His wife, Donna O'Dell,
continues this action on his behalf.

### III.   <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the
pleadings submitted by the parties and the transcript of the
administrative record and enter a judgment affirming, modifying,
or reversing the "final decision" of the Commissioner of Social
Security.  Because in this case the Appeals Council reviewed and
supplemented the decision of the ALJ, my review is of the appeals
Council decision and the portions of the ALJ decision that it
adopted.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000) ("SSA
regulations provide that, if the Appeals Council grants review of
a claim, then the decision that the Council issues is the
Commissioner's final decision"); see also Lopez-Cardona v. Sec'y
of Health and Human Servs., 747 F.2d 1081, 1082 (1st Cir. 1984)
(per curiam) (noting that the Appeals Council finding "became the
final decision of the Secretary").  Review is limited to
determining whether the Appeals Council used the proper legal
standards and found facts based upon the proper quantum of
evidence.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st
Cir. 2000); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)
(per curiam).

The findings of fact of the Appeals Council are accorded deference as long as they are supported by substantial evidence. Ward, 211 F.3d at 655.  Substantial evidence to support factual findings exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." Ortiz, 955 F.2d at 770.  Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35.

The Appeals Council is responsible for determining issues of credibility and for drawing inferences from evidence on the record.  Ortiz, 955 F.2d at 769.  It is the role of the Appeals Council, not the role of this Court, to resolve conflicts in the evidence.  Id.

## IV.  ANALYSIS

O'Dell challenges the Appeals Council's step 5 determination because he contends that it is based on the mistaken premise that

-15-

his RFC allowed him to perform the full range of sedentary work without restriction as of his DLI.[7]  In particular, he complains that the Council lacked medical evidence to support its RFC determination and improperly discounted both Dr. Miller's 1991 opinion that O'Dell could perform a sitting job for no more than three or four hours per day, and Dr. Graf's 2005 opinion that O'Dell was disabled as of his DLI.  O'Dell also complains that the RFC determination fails to account for his obesity and impaired mental condition.  I address each argument in turn.

## A.    The Appeals Council's RFC Determination Is Supported by Substantial Evidence

O'Dell's arguments relating to the medical opinions are best dealt with in two parts - first, whether the Appeals Council impermissibly rejected the opinions outright and in doing so invaded the province of medical experts, and second, whether the Appeals Council was justified in the RFC it determined for O'Dell in light of the medical opinions and the overall record.

----

[7] A claimant's RFC can affect his eligibility for DIB at several different steps in the sequential analysis.  Here, O'Dell challenges the Appeals Council's use of the RFC determination at step 5.  Although the burden of proof shifts to the Commissioner at this final step in the process, the burden shift does not affect the RFC determination, which ordinarily is made at steps 1 though 4.  Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); Her v. Comm'r of Soc. Sec., 203 F.3d 388, 392 (6th Cir. 1999).

1.  **The Appeals Council did not determine O'Dell's
    RFC without the benefit of medical evidence**

O'Dell first contends that the Appeals Council determined his RFC without the benefit of medical evidence.  The short answer to this contention is that it is based on a mischaracterization of the record.  Although the Council declined to credit a portion of Dr. Miller's report, it did rely on the remainder of his evaluation in determining O'Dell's RFC.  Thus, the real issue the case presents is whether the Council erred in making selective use of the medical evidence.

2.  **The Appeals Council properly considered medical
    evidence in determining's O'Dell's RFC**

O'Dell complains that the Appeals Council improperly discounted Dr. Miller's opinion that he could perform sitting work for no more than three or four hours per day and Dr. Graf's opinion that he was disabled as of his DLI.[8]  Several factors determine the weight that a medical opinion is due, including (a) the nature, length, and specialty of the examining relationship, (b) the amount of objective medical signs and laboratory findings supporting the opinion, and (c) consistency of the opinion with

---

[8] The record also includes a conclusory opinion from Dr. Kelley that O'Dell was completely disabled in 2002, and a similar opinion from Dr. Kendall in 2005.  (Tr. at 155, 180.)  Neither physician, however, expressed an opinion as to whether O'Dell was disabled as of his DLI.

the record as a whole.  20 C.F.R. § 404.1527.  I will analyze these factors in turn.

### a. Nature, length, and specialty of the examining relationship

Medical opinions that are rendered by treating physicians, particularly when based on a large number of examinations, may be given greater weight because such opinions often provide "a detailed, longitudinal picture of [the claimant's] medical impairment. . . ." 20 C.F.R. 404.1527(d)(2).  In the present case, however, O'Dell was only examined by Dr. Graf once (and only then at his attorney's behest).  (Tr. at 8.)  O'Dell was examined twice by Dr. Miller as a requirement of his Worker's Compensation claim.  (Tr. at 7, 153.)  Because neither doctor was able to base his opinion on ongoing, detailed treatment of O'Dell, the Commissioner was entitled to give them less weight.

Medical examinations conducted after the relevant injury period are also of limited relevance in disability determinations.  See Gonzalez-Rodriguez v. Barnhart, 111 Fed. Appx. 23, 25 (1st Cir. 2004) (per curiam) (holding that a consultive examination and treatment were of "limited value" where both occurred "after [claimant's] insured status had expired"); see also Evangalista v. Sec'y of Health and Human Servs., 826 F.2d 136, 140 n.3 (1st Cir. 1987) (noting that where

-18-

a doctor did not examine the claimant until over four years after the claimant's last insured date, the doctor's ability to shed light on whether the claimant was incapacitated was "seriously curtailed").  Here, the retroactive findings of Dr. Graf were of severely diminished value to the ALJ and Appeals Council because they were based on examinations that took place twelve years after claimant's insured status had expired.  (Tr. at 180, 254.)

Opinions rendered by physicians retained by claimant's counsel ("advocacy opinions") may also be given less weight.  See Evangelista, 826 F.2d at 139; see also Coggon v. Barnhart, 354 F. Supp. 2d 40, 53 (D. Mass. 2005) (holding that the ALJ reasonably gave less weight to an "advocacy" opinion because it indicated a "potential bias . . . to advocate on [claimant's] behalf").  In discussing the credibility of the medical opinion offered, the court in Evangelista noted that the inference was "inescapable" that the physician was retained by the claimant's counsel to evaluate his case.  Evangelista, 826 F.2d at 139.  Here, O'Dell was evaluated by Dr. Graf only at the express request of his attorney.  (Tr. at 8.)  In this case, too, the inference is "inescapable" that his opinions were obtained specifically for the purpose of bolstering O'Dell's case, and the Appeals Council was correct to give them less weight.

Opinions rendered by specialists related to that doctor's area of speciality are generally given more weight. 20 C.F.R. § 404.1527.  Here, Dr. Graf and Dr. Miller, both orthopedists, were working within their specialty when they rendered opinions regarding O'Dell.  (Tr. at 256.)  While this factor does support giving more weight to Dr. Graf and Dr. Miller, it is not determinative in light of the other aspects of the examining relationship discussed above, all of which made the medical opinions less probative.

Considering the first factor overall, the Appeals Council was entitled to give those opinions significantly less weight in determining whether O'Dell was disabled because the medical opinions at issue were offered by non-treating doctors after minimal examination of O'Dell.  This is particularly true of Dr. Graf, whose retrospective advocacy opinions could reasonably have been given even less weight.

### b.  Existence of objective medical signs and laboratory findings

A lack of objective medical support for an injury may be considered as evidence that a claimant is not disabled. 20 C.F.R. 404.1527(d)(3); Gordils v. Sec'y of Health and Human Servs., 921 F.2d 327, 329 (1st Cir. 1990) (per curiam) (holding that where the only examining doctor found "no objective evidence

of a disabling back impairment," the Secretary was justified in treating that opinion as evidence of an RFC for sedentary work); Dupuis v. Sec'y of Health and Human Servs., 869 F.2d 622, 623 (1st Cir. 1989) (per curiam) (upholding Appeals Council's denial of disability where there was "no medical evidence in the record contemporaneous with [the time period at issue] to support [the claimant]").

In this case, as in Dupuis and Gordils, there was insufficient contemporaneous, objective evidence in the medical opinions to support O'Dell's claims that he was unable to work during the relevant period.  The only contemporaneous report was from Dr. Miller, who explicitly stated he "[did not] find any hard objective evidence of nerve root impingement to suggest that there's a problem."  (Tr. at 153.)  Dr. Miller was also unable to substantiate his diagnosis with a CT scan, MRI, or myelogram because O'Dell was either unwilling or unable to undergo the procedures.  (Tr. at 153.)  The Appeals Council could reasonably have treated this as positive evidence that O'Dell was not disabled prior to his DLI.

Finally, the Appeals Council was also entitled to give less weight to the medical opinion of Dr. Graf because his opinion was based in part on false information, specifically statements by O'Dell that he suffered from post-traumatic stress disorder and

multi-organ failure as a result of exposure to Agent Orange while serving in Vietnam.  (Tr. at 255, 261.)  This false information affected Dr. Graf's eventual diagnosis and bears on plaintiff's general credibility in reporting his symptoms to his doctors. The general lack of objective medical information to substantiate the opinions of Dr. Graf and Dr. Miller justified the Appeals Council in giving less weight to those medical opinions.

### c.  Consistency of the opinions with the record as a whole

Substantial evidence existed in this case that contradicted parts of the medical opinions at issue.  In particular, gaps in treatment can be taken as evidence that a claimant was not disabled during the relevant time period.  See Irlanda Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (holding that gaps in claimant's medical record may be considered as evidence that an injury is not as severe as alleged).  In this case, the fact that O'Dell apparently did not seek any treatment for his back between June of 1993 and October of 1999, a time period during which he later alleged he was completely incapacitated by pain, could have been considered by the Appeals Council as evidence O'Dell was not disabled.

O'Dell's testimony that he settled his Worker's Compensation claim in 1991 to "pursue another business opportunity" also suggests that he did not consider himself to be in such pain that he could not work.  (Tr. at 157); See Dupuis v. Sec'y of Health and Human Servs., 869 F.2d 622, 624 (1st Cir. 1989) (per curiam) (upholding denial of disability in part because claimant was able to work during the period at issue).  It defies common sense that someone who, by his own allegation, was incapable of working in December 1991 would be actively pursuing a separate employment opportunity at the same time.  The Appeals Council could have considered this as evidence that O'Dell was not disabled during the relevant period.

Additionally, some of the medical evidence presented weighed against disability.  The contemporaneous medical examination of Dr. Miller indicated that O'Dell was suffering from a "lower back strain" and that he could perform some sedentary work, though for only a few hours at a time.  (Tr. at 154.)  Dr. Miller also stated that a "work hardening program" could eventually allow O'Dell to do light work at a sitting position.  (Tr. at 154.) This part of Dr. Miller's medical opinion could have been taken by the Appeals Council to be inconsistent with the opinion that O'Dell was disabled for the necessary twelve-month period during the relevant time period.

-23-

Finally, to the extent that O'Dell ever received treatment, the evidence indicated that he only took medication for mild to moderate pain and was able to perform relatively vigorous daily activities such as swimming and mowing the lawn.  (Tr. at 193, 201.)  This further supports the decision of the Appeals Council. See Albors v. Sec'y of Health and Human Servs., 817 F.2d 146, 147 (1st Cir. 1986) (per curiam) (noting that "[the medical evidence], together with the fact that claimant apparently takes nothing stronger than aspirin, supports the ALJ's rejection of claimant's assertions of disabling pain"); Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986) ("[i]n developing evidence of pain or other symptoms," the ALJ must investigate, among other things, "[t]he claimant's daily activities").

Looking at all of the above factors, neither the ALJ nor the Appeals Council erred in choosing not to credit either Dr. Graf's retroactive opinion or the portion of Dr. Miller's opinion that O'Dell could only work three or four hours per day.  The opinions were unsupported by clinical and laboratory diagnostics and inconsistent with other evidence.  The retroactive opinion of Dr. Graf was also based on limited visits with O'Dell that took place more than a decade after the relevant insured time period.  The Commissioner fully considered these opinions, and after viewing

-24-

all of the evidence presented made a permissible, commonsense determination that O'Dell was capable of sedentary work. Particularly when combined with the positive evidence that O'Dell was not disabled, such as the lack of treatment, this RFC determination was supported by substantial evidence.

**B.**    **The Appeals Council Properly Considered O'Dell's Other Health Complications in Determining His RFC**

The Commissioner is required to consider all impairments when making an RFC evaluation, regardless of whether or not those impairments are determined to be severe.  See 20 C.F.R. § 404.1545(e).  In O'Dell's case, the Appeals Council determined that O'Dell's obesity was severe but did not give such a designation to his mental impairment.  Nevertheless, the Appeals Council properly considered O'Dell's obesity and mental impairment in making its RFC determination.

**1.   Obesity**

O'Dell alleges that the ALJ erred in failing to consider his obesity in combination with his back impairment.  At O'Dell's initial hearing, the ALJ found that his obesity was a severe impairment under step 2 of the five-part test.  (Tr. at 21.) The ALJ concluded, however, that even in combination with O'Dell's lower back strain, the two impairments did not disable him from all employment.  (Tr. at 21.)  Information in the case record

substantiates this finding.

Records of O'Dell's obesity date back to at least 1986. (Tr. at 132.)  O'Dell was able to work even with his obesity until his injury in 1990, and neither complained that his obesity limited his functional capacity, nor speculated that his back disorder was exacerbated by his obesity during the relevant period.  In his disability application filed in 2002, O'Dell asserted that he could not stand for long periods, breathe well, lift, or sit long in one place.  (Tr. at 52.)  However, O'Dell never suggested that these conditions stemmed from his obesity and did not specify how these limitations affected his ability to work.  See 20 C.F.R. § 404.1512(c) ("[claimant] must provide evidence . . . showing how your impairment(s) affects your functioning during the time you say that you were disabled, and any other information we need to decide your claim"); see also Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (per curiam) (holding that where the claimant failed to specify how his obesity affected his ability to work, the ALJ could have concluded that it was not disabling).  It was up to O'Dell to specifically allege how his obesity affected his ability to work during the period in question, and he failed to meet that burden.

Additionally, it is worth noting again that during the period in question, O'Dell settled his Worker's Compensation

-26-

claim because he wanted to "pursue another business opportunity." (Tr. at 157.)  This piece of evidence suggests that O'Dell himself knew that he was capable of employment during the very period that he was allegedly disabled.

Despite O'Dell's failure to present evidence showing that his obesity was disabling, the ALJ and Appeals Council still considered O'Dell's obesity and simply concluded that it was generally insufficient, either by itself or in combination with other impairments, to constitute a disability.  (Tr. at 21.) This factual finding is entitled to deference, and given the lack of evidence of its effect on disability put forward by O'Dell, that decision was supported by substantial evidence.  Indeed, even if the ALJ had failed to consider O'Dell's obesity at all, this case would still not warrant a remand.  See Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005) (ALJ's failure to mention obesity did not require remand where claimant did not specify how her obesity should affect her case).

Because O'Dell failed to prove that his obesity affected his ability to work, and because O'Dell's obesity was adequately addressed in the ALJ's consideration of the medical source opinions, the ALJ did not err in failing to specifically assess the effects of O'Dell's obesity.

## 2. **Mental Impairments**

Finally, O'Dell alleges that the Appeals Council erred in failing to make findings using the special technique for mental impairments outlined in 20 C.F.R. § 404.1520a. O'Dell did not meet his burden of establishing that mental issues prevented him from working. In fact, he never even alleged this. Thus, the ALJ was not required to use the SSA's special technique.

Failure to seek medical treatment can be construed as evidence that an impairment is not as severe as the claimant suggests. See Ortiz, 955 F.2d at 769 (holding that gaps in the medical record are "evidence" for the court). O'Dell never sought medical treatment during the period in question for his mental impairment.[9] Furthermore, O'Dell never alleged, either in his DIB application or in his testimony in front of the ALJ, that his mental impairments prevented him from working. (Tr. at 25-40, 52). Where a claimant fails to specifically allege how mental impairments contributed to disability, the ALJ is not required to consider those mental impairments. 20 C.F.R. § 404.1512; see also Gray v. Heckler, 760 F.2d 369, 374-75 (1st Cir. 1985)

---

[9] In fact, O'Dell's long medical history of mental health problems never before precluded him from working. Counseling services and hospitalization due to mental instability were sought on an inconsistent basis and it appears from the evidence on the record that O'Dell was able to hold a number of jobs prior to his injury despite his impairment.

(holding that where claimant failed to present evidence that mental impairment affected her level of disability, ALJ was not required to address that impairment); Alvarado v. Weinberger, 511 F.2d 1046, 1049 (1st Cir. 1975) ("[t]he mere existence of a psychoneurosis or an anxiety reaction does not constitute a disability"); Barrett v. Barnhart, 2003 WL 1701288, at *5 (D. N.H. Mar. 28, 2003) ("[t]he claimant is responsible for providing specific medical evidence of his alleged mental impairment and its effect upon his functional capacity for work").

All of these facts demonstrate that O'Dell did not meet his burden of establishing that his mental impairment affected his ability to work; therefore, the ALJ was not required to evaluate O'Dell's impairment using the special technique set forth in 20 C.F.R. § 404.1520a.

## V. <u>CONCLUSION</u>

The ALJ did not err at any step in the five-step process, nor did the Appeals Council in adopting and supplementing the ALJ's conclusions.  Because I do not find that any error occurred, there is no reason to address the parties' final argument of whether reversal versus remand would have been appropriate had error been found.  For the foregoing reasons, I grant the Commissioner's motion to affirm (Doc. No. 20) and deny

O'Dell's motion to reverse (Doc. No. 18).  The clerk is directed

to enter judgment accordingly and close the case.

    SO ORDERED.


                          /s/Paul Barbadoro
                          Paul Barbadoro
                          United States District Judge

September 8, 2010

cc:  Francis M. Jackson, Esq.
     Karen B. Fitzmaurice, Esq.
     Robert J. Rabuck, Esq.